UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

RENEE C. GRAHAM            )
    Plaintiff,              )
                            )            1:08-CV-194
v.                        )
                            )            *(Mattice/Carter)*
                            )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,  )
    Defendant.              )

## REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying the plaintiff a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423.

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the disposition of plaintiff's Motion for Judgment on the Pleadings (Doc. 13) and defendant's Motion for Summary Judgment (Doc. 18).

For the reasons stated herein, I RECOMMEND the decision be **REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. §. 405(g). and be **REMANDED** to the Commissioner for further administrative consideration pursuant to Sentence Six of 42 U.S.C. § 405(g)

### Plaintiff's Age, Education, and Past Work Experience

Plaintiff was 53 years old at the time of the ALJ's decision, and has an Associates Degree

1

(Tr. 510). Her past relevant work was as a registered nurse (Tr. 510).

<u>Application For Benefits-Administrative Proceedings</u>

Plaintiff seeks judicial review of the Social Security Administration's (Agency) final decision denying her applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. § 423(d). After two hearings, an Administrative Law Judge (ALJ) found Plaintiff not disabled, and thus not entitled to disability benefits (Tr. 11-22). The Appeals Council then denied Plaintiff's request for review of the ALJ's decision (Tr. 4-7), thereby making the ALJ's decision the Agency's final decision for purposes of judicial review. 20 C.F.R. § 404.981. The Court has jurisdiction under 42 U.S.C. § 405(g).

<u>Standard of Review</u>

The Court must determine whether the ALJ failed to apply the correct legal standard and whether the ALJ's findings of fact were supported by substantial evidence. 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different

2

conclusion. The substantial evidence standard allows considerable latitude to administrative

decision makers because it presupposes there is a zone of choice within which the decision

makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027,

1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y

of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The Court may consider any

evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of

Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The United States Court of Appeals for the Sixth

Circuit ("Sixth Circuit") has held that substantial evidence is "such evidence as a reasonable

mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation

omitted).

Plaintiff asserts there is new evidence to support her claim of disability. Since this

evidence was not presented in the administrative hearing, it can only be considered in the context

of a sentence six remand. In order to remand a case for further consideration of additional

evidence, plaintiff must show that the additional evidence is new and material and there is good

cause for his or her failure to incorporate such evidence in the record during the prior

proceedings. *See* 42 U.S.C. § 405(g); *Cline v. Commissioner of Social Security*, 96 F.3d 146,

149 (6th Cir. 1996); *Casey*, 987 F.2d at 1233. Good cause is shown when the claimant gives a

valid reason for failing to obtain relevant evidence prior to the hearing. *See Cotton v. Sullivan*, 2

F.3d 692, 696 (6th Cir. 1993). Additional evidence is new if it was not in existence or available

to the claimant at the time of the administrative proceedings. *See Sullivan v. Finkelstein*, 496

U.S. 617, 626 (1990). The party seeking remand has the burden to show that remand is

appropriate. *See Oliver v. Sec'y of Health and Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

<u>ALJ's Findings</u>

The ALJ concluded at step five of the sequential analysis that Plaintiff had the residual functional capacity to perform unskilled light to medium work activity. Although unable to perform any past relevant work he concluded Plaintiff was able to perform a significant number of jobs and was thus not under a disability (Tr. 18, 22-23). The ALJ made the following findings in support of the decision, which are conclusive if they are supported by substantial evidence in the record:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.      The claimant has not engaged in substantial gainful activity, since October 9, 2004, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*).

3.      The claimant has the following severe impairments: degenerative disc disease of the cervical and thoracic spine and depression (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform unskilled light to medium work activity.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on March 20, 1953, and was 51 years old on the alleged disability onset date, which is defined as an individual closely approaching advanced age (20 CFR 404.1563).

8.      The claimant has a high school plus two years of college education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

4

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.  The claimant has not been under a "disability," as defined in the Social Security Act, from October 9, 2004, through the date of this decision (20 CFR § 404.1520(g)).

(Tr. 13-22).

Issues Presented

Plaintiff raises the following issues:

1. New and material evidence warrants reconsideration of the ALJ's decision.

2. The ALJ's Residual Functional Capacity ("RFC") finding is not supported by substantial evidence.

3. The ALJ erred by failing to accept the disabling medical source opinions from Plaintiff's treating physician, Dr. Lord, and the consultative examiner, Dr. Mullady.

4. The ALJ erred by ignoring completely the disabling Medical Source Statement completed by treating psychiatrist Kevin Ferguson, M.D.

5. Colloquy between the ALJ and Plaintiff's attorney demonstrates a lack of impartiality on the part of the ALJ towards Plaintiff.

6. The ALJ's decision misconstrues Plaintiff's testimony with respect to her activities of daily living.

Testimony and Medical Evidence

Plaintiff testified that she was unable to work due to pain in her neck and upper back, and headaches (Tr. 517).  She also complained of fatigue, depression and anxiety (Tr. 518, 523).

Plaintiff began seeing Dr. Lord, her primary care physician, in October 2004 (Tr. 208).  In November 2004, Plaintiff first complained of neck pain and headaches (Tr. 206).  Dr. Lord's progress notes through July 2005 indicate that Plaintiff frequently complained of headaches (Tr.

5

195-99, 202-03, 205-06) and neck pain (Tr. 192-94, 196-99, 201-03, 205-06). In January 2005, Plaintiff underwent physical therapy at the request of Dr. Lord (Tr. 288-99).

In March 2005, Dr. Hughes wrote a letter to Dr. Lord indicating Plaintiff has had headaches three out of four days of the week since she was involved in an October 2004 car accident (Tr. 173). Dr. Hughes indicated that Plaintiff had been off work since the accident, but that Plaintiff was planning on returning to work in a week (Tr. 174). He diagnosed vascular/migraine headaches, probably exacerbated by medication usage and possibly related to minor head trauma from her accident (Tr. 174). Dr. Hughes prescribed medication and stated that Plaintiff's outlook was excellent (Tr. 174).

In April 2005, at the request of Dr. Lord, Plaintiff was examined by Dr. Lowry, a spinal surgeon (Tr. 176-78). Plaintiff complained of neck pain, which had improved by 50% since her auto accident, and headaches very frequently (Tr. 176). A Review of Systems showed positive findings for depression, insomnia and nervousness. Plaintiff had positive findings for back pain and neck pain and positive neurological findings of headaches and light headedness or dizziness (Tr. 177). Dr. Lowry diagnosed cervical (neck) disc protrusion, facet arthrosis, spondylosis, degenerative disc disease, and subluxation (Tr. 178). Dr. Lowry recommended cervical spinal injections (Tr. 178).

In July 2005, after an epidural steroid injection, Plaintiff told Dr. Lowry that she was 50% improved since her last visit. Plaintiff stated it took two weeks for the injection to help. She had 3 weeks feeling better, but her main complaint was pain in her head (Tr. 253). A surgical evaluation was to be considered if treatment efforts failed (Tr. 252). In a January 31, 2006 visit, Plaintiff reported pain worse than her last visit. Physical therapy did not help, it worsened her

6

condition. She described pain as aching and constant (Tr. 249).

In August 2005, Dr. Mullady, an internal medicine physician, performed a consultative examination. (Tr. 209-11). Dr. Mullady noted cervical spine trauma in a motor vehicle accident in October, 2004. He noted cervical disk damage and a fractured sternum caused by the accident. Plaintiff had decreased range of motion of cervical spine on physical examination with continuing neck pain and headaches (Tr. 211). Dr. Mullady opined that Plaintiff would be limited to occasionally lifting 10 pounds, standing/walking for 2 hours, and sitting for 6 hours in an 8-hour workday, a limitation consistent with sedentary work (Tr. 211).

In August 2005, Dr. Downey, a State Agency medical consultant, reviewed the evidence of record and found that Plaintiff could lift up to 50 pounds and sit/stand/walk for 6 hours each (Tr. 213, 219). Dr. Downey stated that Dr. Mullady's functional opinion was too restrictive and was not supported by the objective medical findings (Tr. 219).

Progress notes from Dr. Lord from August 2005 through April 2006 indicate that Plaintiff continued to complain of neck/back pain, but headache complaints were minimal (Tr. 304-06, 309, 311, 313). However, on March 7, 2006 Plaintiff complained to Dr. Lowry of continuing headaches (Tr. 247).

In September 2005, Dr. Ferguson, a psychiatrist, wrote a letter indicating Plaintiff was very depressed and nervous (Tr. 220). Dr. Ferguson further stated, given the length of time that has elapsed since Plaintiff's auto accident, he feared her prognosis was poor (Tr. 220). Dr. Ferguson's notes indicate he had only seen Plaintiff on one occasion prior to writing this letter (Tr. 221-22).

Later in September 2005, Dr. Kupstas, a State Agency psychological consultant, prepared

7

a physchiatric review technique form. After review of the evidence of record, he found Plaintiff could perform simple tasks over extended periods, could perform detailed tasks (but with some difficulty at times), could interact with the general public (but with some difficulty at times), and could respond to routine changes in the work place (Tr. 239).

From December 2005 through January 2006, Plaintiff underwent physical therapy at the request of Dr. Lowry (Tr. 271-278).

In January 2006, Plaintiff complained to Dr. Lowry of neck and upper-back pain which disturbed her sleep. He diagnosed the cervical spine with disc protrusion at C6-7, facet arthrosis at C3-4, C4-5 and C5-6, cervical spondylosis, cervicalgia, degenerative disc disease at C6-7 and subluxation at C5-6 with facet OA worse on the left. His diagnosis of the thoracic spine was degenerative disc disease T3-4, T4-5, T6-7, T7-8 and T 8-9, facet syndrome multi-level, thoracic spondylosis/osteoarthritis, thoracic pain with disc bulging/protrusion at T7-8 and T8-9 (Tr. 248, 249). Dr. Lowry recommended spinal injections (Tr. 248).

On March 7, 2006, Plaintiff told Dr. Lowry that the injection had helped her somewhat, although she still had some upper and mid thoracic pain (Tr. 247). She was also complaining of continuing headaches, her main concern on that date (Tr. 247). Dr. Lowry recommended that Plaintiff continue her home exercise program as tolerated (Tr. 246). He diagnosed disc protrusion at C6-7, facet arthrosis at C3-4, C4-5 and C5-6, cervical spondylosis, cervicalgia, degenerative disc disease, subluxation at C5-6 and facet osteoarthritis, worse on the left (Tr. 247).

Also in March 2006, at the request of Dr. Lord, Plaintiff was examined by Dr. Turner, a rheumatologist, for her neck/back pain (Tr. 316). Dr. Turner found that Plaintiff had cervical

8

spinal disease due to her auto accident, that Plaintiff had chronic headaches, and that Plaintiff

had fatigue (Tr. 317). Plaintiff was referred to Dr. Ravi Chander for a neurologic evaluation of

her headaches (Tr. 318).

In April 2006, Dr. Lord completed a checklist that indicated Plaintiff could only

stand/walk/sit for one hour per day, required 2-4 hours of bed rest per day, and that Plaintiff

would need to be absent from work on a chronic basis. He assessed her pain as severe. Her

condition would cause lapses of concentration of several hours, 3 or more days per week (Tr.

242-44).

In May 2006, at Plaintiff's second administrative hearing, Dr. Lorber, an orthopedic

surgeon, testified as a medical expert ("ME") (Tr. 531). Dr. Lorber, who never examined

plaintiff, stated he totally disagreed with Dr. Mullady's opinion, and that the opinion was not

supported by the evidence of record (Tr. 533-34). Dr. Lorber stated Plaintiff was capable of

work that involved lifting up to 50 pounds and no restrictions on standing/walking/sitting (Tr.

536).

In June 2006, more than 9 months after he began Plaintiff's treatment, Dr. Ferguson

completed a form that indicated Plaintiff had functional abilities ranging from "good" to "none."

He assessed she had a fair to poor ability to interact appropriately, communicate effectively, and

engage in other aspects of social functioning; a poor ability of concentration, persistence, and

pace and no ability to adapt to stressful circumstances in work or work-like settings. She had a

fair to poor ability to follow work rules and poor ability to deal with the public, a fair to good

ability to maintain personal appearance, a poor ability to deal with work stress, fair ability to

demonstrate reliability and a fair to poor ability to relate to supervisors and co-workers (Tr. 332-

33).  Dr. Ferguson also indicated Plaintiff could not concentrate, focus, or stay on task because of chronic pain and headaches (Tr. 333).

In August 2006, Dr. Kim, a psychiatrist, performed a consultative examination.  Dr. Kim found that Plaintiff had major depression and rated Plaintiff's Global Assessment of Functioning (GAF)[1] at 60 (moderate, but almost mild symptoms) (Tr. 326).  Dr. Kim also completed a check list that indicated Plaintiff's functional limitations ranged from "none" to "moderate." He found moderate restrictions in responding to work pressures in a usual work setting and responding appropriately to changes in a routine work setting, otherwise either no limitation or slight limitation (Tr. 328-29).  Finally, Dr. Kim in his August 29, 2006 evaluation noted that Plaintiff had recently been diagnosed with pseudotumor cerebri, which might explain some of Plaintiff's physical complaints (Tr. 327).

ALJ's Decision

In December 2006, the ALJ found that Plaintiff's assertion of complete disability was not credible and that Plaintiff was capable of performing unskilled light to medium work.[2]  (Tr. 18). Based on that finding, the ALJ applied the Medical Vocational Guidelines to direct a finding of

---

[1]*The GAF scale is a measure of the individual's overall level of functioning or symptom severity, whichever is worse, and is based only on  psychological, social, and occupational functioning, not physical or environmental limitations.  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. text revision 2000).*

[2]*Light work involves lifting no more than 20 pounds; or it may involve very little lifting, but requires a significant amount of walking or standing; or it may involve some pushing or pulling of arm or leg controls, which requires greater exertion than in sedentary work.  20 C.F.R. § 404.1567(b).*
*Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of up to 25 pounds, and generally requires standing or walking, off and on, for approximately six hours in an eight hour day.  20 C.F.R. § 404.1567(c).*

not disabled.[3]  (Tr. 21-22).

Evidence Received After the ALJ's Decision

In July and October 2006, Dr. Chander, a neurologist, examined Plaintiff at the request of

Drs. Lord and Turner.  In July he felt her symptoms were suggestive of pseudotumor cerebri.  In

August he diagnosed pseudotumor cerebri and analgesic-rebound headaches (Tr. 367-68).  After

some difficulty with the first medication selected for Plaintiff's conditions, Dr. Chander selected

methozolamide, on which Plaintiff seemed to be doing better (Tr. 367).

On October 5, 2006, Plaintiff saw neurologist Adele B. Ackell, M.D. for a second opinion

regarding the diagnosis of pseudotumor cerebri (Tr. 340–41).  In his report, Dr. Ackell noted that

Plaintiff reported headaches since her motor vehicle accident ("MVA") in October 2004.  Dr.

Ackell's note reflects that Plaintiff had noticed some improvement in her headaches, while at a

dose of 50 mg methozolamide twice per day (Tr. 340).  His note also reflects that Plaintiff has a

history of hypertension that began only after the MVA.  In fact, her examination reflected

elevated blood pressure of 200/100.  Dr. Ackell's impression was that Plaintiff's history was

"consistent with pseudotumor cerebri," and he endorsed Dr. Chandler's course of treatment (Tr.

341). Plaintiff complained of frequent headaches after the October 2004 automobile accident.

Dr. Ackell noted that Plaintiff's medication for this condition (Methozolamide) had resulted in

an improvement with her headaches.  She complained of pain in the cervical and thoracic spine

and headaches which originated in the neck and shoulders independently (Tr. 340).

On October 20, 2006, Plaintiff returned to Dr. Chander.  Although doing better, she

---

[3]*When applicable, the Agency may show that a claimant is capable of performing a significant number of jobs by relying on the Medical-Vocational Guidelines (the grid rules) in 20 C.F.R. pt. 404, subpt. P, app. 2.*

reporting being able to tolerate only one 25 mg Methazolamide twice per day due to diarrhea (Tr. 367). Dr. Chander planned to continue Plaintiff at that dose and to begin tapering up on a dose of Topamax for headaches. He continued to assess Plaintiff had pseudotumor cerebri and analgesic-rebound headaches (Tr. 367).

<u>Analysis</u>

Plaintiff raises several issues. She seeks remand under Sentence Six based on new and material evidence. She also seeks reversal based on the lack of substantial evidence to support the ALJ's RFC finding, the treating physician rule, the failure to consider one of the opinions of a treating physician, conduct during the hearing before the ALJ indicating a lack of impartiality and finally, misconstruing Plaintiff's testimony regarding her activities of daily living. I will address the issues relating to the new and material evidence last.

<u>The ALJ erred by failing to accept the disabling medical source opinions from</u>
<u>Plaintiff's treating physician, Dr. Lord, and the consultative examiner, Dr. Mullady</u>

Plaintiff argues the ALJ erred by adopting the opinion of the medical examiner ("ME"), who never examined Plaintiff, and discounting the opinions of Drs. Mullady and Lord, who had either examined Plaintiff or had treated her for an extended period of time (Plaintiff's Br. at 11). The Commissioner responds arguing the ALJ had a sufficient basis for discounting both of these physician opinions. I note that a third treating physician, Dr. Ferguson, gave an opinion which also appears consistent with a finding of disability (Tr. 332, 333).

The treating physician rule which gives greater and sometimes controlling weight to the treating physician is based on the assumption that a medical professional who has dealt with a claimant over a long period of time has a deeper insight into the claimant's

12

condition than one who has examined a claimant but once or simply reviewed the medical evidence. *See Barker v. Shalala*, 40 F.3d 789 (6th Cir. 1994). However, the ALJ is not required to accept any medical opinion, even that of a treating physician, if that opinion is not supported by sufficient clinical findings. See 20 C.F.R. § 404.1527(d)(3); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993) ("This court has consistently stated that the [Commissioner] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.").

Social Security regulations establish a hierarchy of preference to be given to medical opinions: examining sources are to be given more weight than non-examining sources; treating sources are to be given more weight than non-examining sources; and treating sources are to be given more weight than the opinions of one-time examining sources. The rule establishing the first level of preference, that opinions of examining sources are to be given more weight than the opinions of non-examining sources, is found at 20 C.F.R. § 404.1527 (d)(1) (for Social Security Disability Insurance ("SSDI") cases under Title II of the Act) or 20 C.F.R. § 416.927(d)(1) (for SSI cases under Title XVI of the Act). Those parallel regulations state: "Generally, we give more weight to the opinion of a source who has examined you than the opinion of a source who has not examined you."

The next level of the hierarchy states that the opinions of treating sources are to be given more weight than the opinions of a source who has conducted only a one-time examination. The parallel regulations on this issue, 20 C.F.R. § 404.1527(d)(2) (SSDI) or 20 C.F.R. § 416.927 (d)(2) (SSI) state:

> Generally, we give more weight to opinions from your treating
> sources, since those sources are likely to be medical professionals
> most able to provide a detailed, longitudinal picture of your
> medical impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the objective
> medical findings alone or from reports of individual examinations,
> such as consultative examinations or brief hospitalizations. If we
> find that a treating source's opinion on the issue(s) or the nature
> and severity of your impairment(s) is well-supported by medically
> acceptable clinical and laboratory diagnostic techniques and is not
> inconsistent with other substantial evidence in your case record, we
> will give it controlling weight.

The preference for treating sources has been approved by the Court of Appeals, which has

held that the opinions of a treating physician are entitled to great weight and generally are entitled

to greater weight than the contrary opinions of a consulting physician who has examined the

claimant on only a single occasion. *Farris v. Secretary of Health and Human Services*, 773 F.2d

85, 90 (6th Cir. 1985); *Harris v. Heckler*, 765 F.2d 431, 435 (6th Cir. 1985); *Hurst v. Schwieker*,

725 F.2d 53, 55 (6th Cir. 1984); *Stamper v. Harris*, 650 F.2d 108, 111 (6th Cir. 1981); *Branham*

*v. Gardner*, 383 F.2d 614-634 (6th Cir. 1967).

In *Walker v. Secretary of Health and Human Services*, 980 F.2d 1066, 1070 (6th Cir.

1992), the court held:

> The medical opinion of the treating physician is to be given
> substantial deference – and, if that opinion is not contradicted,
> complete deference must be given. [Citations omitted]. The
> reason for such a rule is clear. The treating physician has had a
> greater opportunity to examine and observe the patient. Further, as
> a result of his duty to cure the patient, the treating physician is
> generally more familiar with the patient's condition than are other
> physicians. [Citations omitted].

Now, turning to the record before me, on April 7, 2006, Plaintiff's long-time treating

14

physician completed a Medical Source Statement that endorsed limitations that preclude Plaintiff's ability to perform full-time work at any exertional level (Tr. 242–44). On August 15, 2005, at the request of the Commissioner, Plaintiff attended a consultative examination performed by Thomas Mullady, M.D. (the "CE"), where she reported, among other things, severe headaches relieved only temporarily by epidural steroid injections. After examining Plaintiff, Dr. Mullady opined that she was capable of only sedentary work at most (Tr. 209–11). Both of these assessments support a finding of "disabled." Rather than accept either of these disabling assessments, the ALJ relied upon the ME's testimony, a physician who had never examined plaintiff but had reviewed records, and on that basis and an opinion of a non-examining State Agency Physician, found Plaintiff capable of light to medium work and thus not disabled.

In this case, the ALJ accepted the opinion of the ME over the opinions of two other doctors who had either treated Plaintiff for an extended period or who had physically examined Plaintiff and the opinion of a treating Psychiatrist. The ME never had the opportunity to personally and physically examine Plaintiff and therefore did not have that unique perspective of the treating physicians.

As Plaintiff argues, Dr. Lord's assessment precludes all work activity in several different ways. Of particular importance is Dr. Lord's assessment that Plaintiff suffers "severe" pain which would cause lapses in concentration for several hours, three or more days per week (Tr. 243). This limitation alone would preclude all full-time work and lead to a finding of "disabled," should that opinion be supported by the medical evidence and accepted as controlling. If unable to perform full time work, Social Security Ruling 96-8p directs a finding of disability. Specifically, SSR 96-8p provides:

15

> Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental work activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

SSR 96-8p.

Further, Dr. Mullady's assessment is consistent with sedentary work, which is a disabling assessment in this case. Social Security Regulations define "sedentary work" as follows:

> (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §404.1567 (a) and 416.967 (a).

Social Security's regulations provide a structure for determining disability referred to as the Medical-Vocational Guidelines (the "Grids"). 20 C.F.R. Part 404, Subpart P, Appendix 2. Under the Grids, Plaintiff would be considered an individual "closely approaching advanced age." If limited to performing only full-time sedentary work, Plaintiff would be found disabled under Rule 201.14 of the Grids. Therefore, if the ALJ had accepted the CE's assessment as controlling, a finding of "disabled" would have followed.

In the instant case, however, the ALJ rejected the opinions of both the long-time treating doctor and the CE, in favor of the ME's opinion, and also failed to mention the disabling assessment of the treating Psychiatrist, as will be discussed later.

Just as treating physicians' opinions are afforded the greatest weight, the opinion of a one-time examiner should generally be favored over a doctor who has not seen the claimant at

all.  20 C.F.R. § 404.1527(d)(1).  The Court of Appeals has held that the Commissioner cannot

disregard opinions of a consulting physician which are favorable to the claimant.  *Lashley v.*

*Secretary of Health and Human Services,* 708 F.2d 1048, 1054 (6th Cir. 1983).   For a

combination of reasons, I conclude the manner in which the ALJ weighed the various opinions

was not supported by substantial evidence.

> The ALJ erred by ignoring completely the disabling Medical Source Statement completed
> by treating psychiatrist Kevin Ferguson, M.D.

Plaintiff next asserts error for the failure of the ALJ to mention the disabling opinion of

the treating Psychiatrist, Kevin Ferguson, M.D.  The Commissioner acknowledges the ALJ did

not address the opinion explicitly but argues it is clear why he discounted it, arguing the ALJ

gave it little weight because it was not supported by a diagnosis, treatment plan or

clinical/objective findings in the record.   The ALJ made it clear that he was giving great weight

to Dr. Kim's opinion, which found that Plaintiff's functional limitations ranged from "none" to

"moderate." (Tr. 20, 326, 328-29).

Plaintiff began seeing treating psychiatrist Kevin Ferguson, M.D. in September 2005.  The

record reflects some eight visits, five of which were before the assessment which was not

addressed by the ALJ (Tr. 220–22; 321–23; 496–98).  Dr. Ferguson's notes make clear that

Plaintiff was functioning well psychologically until her MVA, and, since that point, she had

struggled with significant pain and resulting frustration and depression. (Tr. 220).  His notes

reflect that Plaintiff had lost interest in life and felt hopeless about returning to a prior life that

included working for over thirty years as a registered nurse (Tr. 220).  Due to the length of time

between the MVA and Plaintiff's seeking out psychiatric help, Dr. Ferguson "fear[ed] that her

prognosis [was] poor." (Tr. 220). The ALJ rejects Dr. Ferguson's September 8, 2005 diagnosis stating his treatment records did not make a diagnosis and gave no treatment plan or clinical and objective findings found in the record (Tr. 20).

On June 5, 2006, Dr. Ferguson completed a Medical Source Statement that provided an opinion as to Plaintiff's social, occupational and vocational functioning (Tr. 332–33). In this assessment, Dr. Ferguson endorsed limitations that preclude all work activity on a full-time, competitive basis. In support of these findings, Dr. Ferguson notes Plaintiff could not concentrate or stay on task, was limited emotionally and medically by chronic pain and headaches (Tr. 332–33). This document was before the ALJ well prior to the date of his decision.

As Plaintiff argues and the Commissioner must concede, the ALJ's decision fails to acknowledge Dr. Ferguson's assessment. He may have decided to reject the opinion in favor of that of Dr. Kim, but his failure to address these findings leaves the Court with no way to assess what weight he would have given it. Under 20 C.F.R.§ 404.1527, the ALJ is required to consider and weigh all opinions in the file, especially those rendered by a treating source.

> .................
> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive............
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)........**We will always give good reasons in our notice of determination or**

> **decision for the weight we give your treating source's opinion**
>
> (emphasis added)

20 C.F.R.§ 404.1527

I conclude it was error for the ALJ to fail to address the disabling opinion of Dr. Ferguson.

### Colloquy between the ALJ and Plaintiff's attorney demonstrates a lack of impartiality on the part of the ALJ towards Plaintiff

At the close of the supplemental hearing, the following colloquy occurred between the ALJ and the attorney representing Plaintiff at the hearing:

> ALJ: . . . . I guess if this lady has a problem, it's going to be in the depression area. I don't think she's really got a physical problem that was going to make much out of this
>
>       . . . .
>
> ALJ: - - there's a question here, though. Is she getting any kind of private insurance or does she have any kind of insurance? Let me tell you something what's bad about this because I don't know the answer. But if she's getting any kind of coverage at all, it's a slam dunk, you know, as being not a very credible presentation.
>
> ATTY: How about - - can I find out for you? I'll let you know.
>
> ALJ: Oh, I don't really care. I mean, I think it'd be prejudicial in a way - - you're right. But since you bring up the point that she has an extensive and successful work career, I would say that's a plus in her column. But then look at the other side of the equation. Her spouse is retired. They might have adequate resources to want to start traveling around in the camper and doing a lot of things, going down to Florida and so forth. Maybe they don't need that money. Or maybe she's getting long-term disability on her private policy that we don't know about. We just don't really know what's the - - maybe also, I don't know the story. There was this motor vehicle accident and these alleged traumas. Maybe there's a big lawsuit cooking out there. . . . Her credibility of being a good worker is offset by her husband being much older and being retired. Those things create equally interesting connotations. If she was receiving long term disability or had a potential multimillion dollar lawsuit

19

> allegedly out there because she lost a $60,000 a year job and she's
> fighting with the insurance company, that would just be destructive
> to any intelligent analysis of credibility. So what I'm really going
> on is the medical facts. I'm just going to play it down the middle
> like a golfer hoping to hit the, you know, the ball in the fairway and
> I'm just going to go on the medical facts.

(Tr. 540-41).

Plaintiff argues the foregoing statements made on the record by the ALJ are clearly contradicted by the evidence; Ms. Graham does not have a personal injury lawsuit pending; she has no private disability insurance; and she certainly is not vacationing with her "older" and "retired" husband in "Florida." These are hypothetical "facts" that are unsupported by the record.

I agree with Plaintiff that these statements made by the ALJ demonstrate a predisposed impartiality toward Plaintiff. The ALJ never inquired of Plaintiff during the hearing regarding any of these possibilities. Assuming that Plaintiff hypothetically was involved in a personal injury lawsuit and was pursuing a claim with her hypothetical private disability insurance, it is difficult to understand how such behavior would be "destructive to any intelligent analysis of credibility." (Tr. 541). These comments on the record certainly give the appearance that the ALJ failed to act completely as a neutral and impartial fact-finder. The ALJ's statement, "I don't think she's really got a physical problem," seems quite inconsistent with the medical record and his opinion essentially rejects her complaints of pain as consistently reported to her treating physicians.

Plaintiffs have a right to an unbiased ALJ (20 C.F.R. §§ 404.940, 416.1440). Remand for a full and fair hearing before a different ALJ can be ordered by the court. *Ventura v. Shalala*, 55 F. 3d 900, 903-905 (3d Cir. 1995). Whether the ALJ is actually impartial or not, in order to avoid

the appearance of impartiality, I recommend the Commissioner consider assigning this case to a different ALJ on remand.

  <u>The ALJ's Decision Misconstrues Plaintiff's Testimony with Respect to her Activities of Daily Living</u>

  In his decision, the ALJ summarily states "[a]ccording to the claimant's testimony at the hearing, she is able to grocery shop, cook, do laundry, make beds, clean bathrooms, occasionally sweep and vacuum, dust, water plants, and visit her daughter." The ALJ found that these activities were "not inconsistent with the ability to perform light to medium work." Looking at these activities as the ALJ portrays them, Plaintiff notes that one could view Plaintiff as an active, otherwise healthy fifty-five year old individual. Plaintiff argues the direct examination performed by the ALJ, provided Plaintiff little opportunity to explain, in any meaningful way, what she typically did in an average day. (Tr. 513–16). The exchange between the ALJ and Plaintiff is as follows:

> Q: All right. I want to discuss some household chores that people normally do and I want you to answer yes or no as to whether you do them. You may explain after you've said yes or no. Do you cook?
>
> A: Yes.
>
> Q: Do you clean the kitchen or wash dishes?
>
> A: I use a dishwasher.
>
> Q: Do you shop for groceries?
>
> A: Usually my husband or my daughter goes with me.
>
> Q: <u>It's a yes or no</u>. (emphasis added).
>
> A: Oh, yes, I do.
>
> Q: Thank you. Do you run laundry?
>
> A: Yes. My husband helps me with carrying it because I have difficulty with anything heavy.

21

Q: Okay. Do you make your bed?

A: Yes.

Q: Do you clean in and around the bathroom?

A: Yes.

Q: Do you have occasion to sweep like a porch or somewhere in the kitchen, that type of thing?

A: Yes.

Q: Do you ever have occasion to mop in a bathroom or a kitchen floor. Sometimes people have linoleum floors, something like that?

A: Um-hum. My -- no, I don't do it. My husband does that.

Q: Do you vacuum if you have carpets?

A: My husband --

Q: That's a yes or a no. (emphasis added).

A: -- yes, yes, I do occasionally. But my husband does most of it.

Q: Do you dust around the house?

A: Yes.

Q: Do you do any type of yard work or gardening?

A: Yes, but my husband does most everything. I just walk around and look at it and water things.

. . . .

Q: All right. What are typical activities that you do during the day? Or night? What do you do to pass the time?

A: Basically, I walk around the house a little bit, I lay down, I walk around outside. I do a little bit of housework. If I do something, I get worn out and then I lay down on the couch. I have a lot of pillows I prop up on. I have a daughter that lives a block away and sometimes we get together. . . .

(Tr. 513–15).

I agree with Plaintiff's assessment that her description of her daily activities taken as a whole is consistent with her allegations of disability. The ALJ states her testimony was consistent with someone who had the ability to perform full-time light or medium work activity.

The ALJ, however, failed to adequately explain or support that finding. The ALJ stated Plaintiff was able to "grocery shop" and "do laundry," but failed to acknowledge that she testified to performing these activities with the assistance of her husband. The ALJ failed to explain how the other activities cited would correlate to an ability to perform full-time work activity. The ALJ did not ask Plaintiff how often she performed these activities and to what degree. He required her to answer with only a "yes or no" twice during the brief examination. When Plaintiff was allowed the opportunity to elaborate, she explained that "if I do something, I get worn out and then I lay down on the couch." (Tr. 515). The ALJ apparently found this testimony less than fully credible, but he did not explain why. By supporting his decision in part on her activities of daily living and at the same time leaving out significant limitations in her testimony, the ALJ does misconstrue Plaintiff's testimony, and his decision presents her testimony in a light that is less restrictive than her actual testimony.

In summary, the ALJ rejects the opinions of two treating physicians and does not address the opinion of a third treating physician but relies instead on the contrary opinion of two non-treating, non-examining physicians and a consulting psychologist. The ALJ fails to mention the limitations of the treating Psychiatrist and relies on activities of daily living that do not fairly reflect the limitations testified to by plaintiff. On the basis of these combined problems, I conclude there is not substantial evidence to support the conclusion reached.

In cases where there is an adequate record, the Commissioner's decision denying benefits can be reversed and benefits awarded if "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *See Newkirk v. Shalala*, 25 F.3d 316 at 318 (6th Cir. 1994). The record adequately establishes the plaintiff's entitlement to

23

benefits "only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Secretary of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). In this case, there is evidence of disability which I conclude is strong, but not overwhelming, and there is some evidence in the record to support a higher level of function than that alleged by Plaintiff. Because the ultimate decision of disability rests with the Commissioner, and because there is evidence in the record to the contrary, I conclude remand under Sentence Four is the proper remedy.

<u>Sentence Six Remand</u>

Plaintiff also seeks remand under Sentence Six. While her claim was pending at the Appeals Council, Plaintiff submitted additional medical evidence. Plaintiff asserts there is new evidence to support her claim of disability. Since this evidence was not presented in the administrative hearing, it can only be considered in the context of a Sentence Six remand. In order to remand a case for further consideration of additional evidence, plaintiff must show that the additional evidence is new and material and there is good cause for his or her failure to incorporate such evidence in the record during the prior proceedings. *See* 42 U.S.C. § 405(g); *Cline v. Commissioner of Social Security*, 96 F.3d 146, 149 (6th Cir. 1996); *Casey*, 987 F.2d 1230 at 1233 (6th Cir. 1993). Good cause is shown when the claimant gives a valid reason for failing to obtain relevant evidence prior to the hearing. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Additional evidence is new if it was not in existence or available to the claimant at the time of the administrative proceedings. *See Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990). The party seeking remand has the burden to show that remand is appropriate. *See Oliver v. Sec'y of Health and Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

24

In this case, Plaintiff asserts the new evidence is material. The Commissioner insists it is not and does not address either the question of whether it was new or whether good cause exists. I will therefore only address the issue of materiality.

Following the supplemental hearing in this case and prior to the issuance of the ALJ's decision, Plaintiff saw two separate neurologists who confirmed a diagnosis of psuedotumor cerebri, otherwise known as intracranial hypertension. Plaintiff's attorney was not able to get this information from these sources before the ALJ issued his unfavorable decision.

On May 22, 2006, Plaintiff presented to neurologist Ravi Chander, M.D. on referral from Dr. Elizabeth Turner, M.D., Plaintiff's rheumatologist (Tr. 369). Plaintiff's chief complaint was headaches since her MVA in October 2004, along with pain centered over her eye. Dr. Chander ordered a lumbar spine puncture, which demonstrated opening cerebrospinal fluid ("CSF") pressure of 22 (Tr. 378). On July 7, 2006, Dr. Chander indicated that this reading was suggestive of pseudotumor cerebri (Tr. 368). Dr. Chander began Plaintiff on a trial of Diamox to reduce the pressure, which unfortunately Plaintiff was unable to tolerate due to adverse side effects (Tr. 340, 367–68).

On October 5, 2006, Plaintiff saw neurologist Adele B. Ackell, M.D. for a second opinion regarding the diagnosis of pseudotumor cerebri (Tr. 340–41). In his report, Dr. Ackell noted that Plaintiff reported headaches since her MVA in October 2004. Dr. Ackell's note reflects that Plaintiff had noticed some improvement in her headaches, while at a dose of 50 mg Methozolamide twice per day (Tr. 340). His note also reflects that Plaintiff has a history of hypertension that began only after the MVA. In fact, her examination reflected elevated blood

pressure of 200/100. Dr. Ackell's impression was that Plaintiff's history was "consistent with pseudotumor cerebri," and he endorsed Dr. Chander's course of treatment (Tr. 341).

On October 20, 2006, Plaintiff returned to Dr. Chander reporting being able to tolerate only one 25 mg Methazolamide twice per day due to diarrhea (Tr. 367). Dr. Chander planned to continue Plaintiff at that dose and to begin tapering up on a dose of Topamax for headaches (Tr. 367).

Pseudotumor cerebri is defined as occurring when the intracranial pressure inside the skull increases for no obvious reasons. Symptoms mimic those of a large brain tumor, although no tumor is actually present. Where no underlying cause can be discovered, this condition is sometimes referred to as idiopathic intracranial hypertension. In this case, the new evidence is clearly material to the outcome of the decision, and there is arguably good cause for failure to incorporate that evidence prior to the ALJ's decision. The ALJ's decision is premised almost entirely on the notion that the claim is grounded in a combination of orthopaedic conditions. Although the record is replete with instances where Plaintiff was reporting frequent headaches since the MVA, her doctors at the time could not pinpoint an orthopaedic reason because the cause of the headaches was discovered to be neurologic in origin. Once the lumbar puncture confirmed elevated CSF pressure, compelling objective evidence supported the diagnosis of pseudotumor cerebri and, in turn, supported Plaintiff's complaints of disabling headaches.

This new and material evidence was not before the ALJ when he issued his decision because the sources of this evidence did not make available same to Plaintiff's counsel prior to the ALJ issuing his unfavorable decision. The entirety of the neurological work-up took place

after both the original and supplemental hearings and before the ALJ issued the decision.

At the supplemental hearing, the ME summarized the evidence that was before him and opined that Plaintiff was capable of full-time medium work. Clearly, the ME was not privy to the subsequent neurologist consultations that confirmed a diagnosis of pseudotumor cerebri. As demonstrated in his testimony, he apparently gave little consideration to Plaintiff's headaches or the source of those headaches. When summarizing Plaintiff's treatment history, the ME recited that Plaintiff's primary complaint at one particular doctor's visit was headaches, and the ME tersely responded that "headaches can come from many causes." (Tr. 535–36). Had the ME known of this diagnosis, I conclude his opinion regarding the claim would likely have been quite different. Further, as Plaintiff argues, the ME, being an orthopaedic specialist, is not necessarily the appropriate expert to comment upon the disabling nature of a neurological condition.

Further, the ALJ clearly demonstrated in his decision that he considered this case to be orthopaedic in nature (Tr. 13–21). In fact, the ALJ stated as much when he found that Plaintiff "has limitations primarily as a result of degenerative disc disease of the cervical and thoracic spine, which restrict her to [medium work]." (Tr. 19). The ALJ's decision also reflect that he found Plaintiff's headaches to not constitute a severe impairment stating that the "record fails to show claimant's ability to work is even minimally restricted due to . . . headaches . . ., which have improved or resolved. . . ." (Tr. 18). As recited by the ALJ himself in his decision, Plaintiff was reporting severe headaches at just about every turn in the course of her treatment. There is no evidence that a series of epidural steroid injections were successful in taking care of this condition, as the ALJ intimated (Tr. 18). Plaintiff continued to report severe recurring headaches to the point that she was finally referred to two neurologists for further workup, who finally

27

discovered the cause of her headaches. At times there may have been fewer complaints but even if Plaintiff's headaches resolved at some point in time, the ALJ will need to address whether there was a period of time during which she would be entitled to a closed period of benefits on the basis of the severe headaches. There is now a known cause of these headaches, supported by objective evidence. I agree with Plaintiff that this information, in all likelihood, would have produced a different outcome in this case, and therefore conclude it was material and that remand under Sentence Six is the proper remedy.

For the reasons stated herein, I RECOMMEND:

1. Plaintiff's motion for Judgment on the Pleadings (Doc 13) be **GRANTED** in part to the extent that it seeks remand and **DENIED** in part, to the extent it seeks reversal for an award of benefits,

2. The Commissioner's Motion for Summary Judgment (Doc 18) be DENIED,

3. The Commissioner's decision be **REVERSED AND REMANDED** under Sentence Four of 42 U.S.C. § 405(g) and **REMANDED** to the Commissioner for further administrative consideration of new and material evidence under Sentence Six of 42 U.S.C. § 405(g).[4]

Dated:  August 14, 2009                    s/William B. Mitchell Carter
                                            UNITED STATES MAGISTRATE JUDGE

---

[4]Any objections to this Report and Recommendation must be served and filed within ten (10 days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).